**United States District Court**
**for the**
**District of Minnesota**

Laura Bernstein, individually and )
On behalf of All Others Similarly Situated, )
)
vs. )       Civil Action No. 08-CV-05874 DWF/JSM
)
Extendicare Health Services, Inc.; and )
Extendicare Homes, Inc., )

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

## I. INTRODUCTION

Plaintiff's claims seek to redress economic harm caused to her and other residents of

Extendicare facilities due to the Defendants' fraudulent conduct.  Not only has Plaintiff

been misled by false and misleading statements of Defendants that purport to provide

more care than actually rendered, but an entire class of residents has similarly suffered in

Defendants' facilities as a result of their deceptive statements and policies.  Plaintiff's

claims are based on Minnesota's Consumer Fraud Act, Minn. Stat. §§ 325F.68-.70

("CFA"); Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43-.48 ("DTPA"); False

Statement in Advertising, Minn. Stat. § 325F.67 ("FSA"); Senior Citizens & Disabled

Persons, Minn. Stat. § 325F.71 ("SCDP"); and Vulnerable Adults Act, Minn. Stat. §§

626.557 & 626.5572 ("VAA").  Defendants' motion to dismiss statutory fraud and VAA

claims should be denied because Plaintiff has sufficiently stated her claim; the

Defendants' false promises, misrepresentations, and failure to disclose pertinent

information about their facilities mislead vulnerable adults who rely on Defendants to meet substantial health needs; and Defendants are mandated reporters who failed to report maltreatment.

When evaluating a Fed.R.Civ.P. 12(b)(6) Motion to Dismiss, the Court must, "assume all facts in the Complaint to be true and construe all reasonable inferences from those facts in the light most favorable to the complainant." *Solvay Pharms., Inc. v. Global Pharms.*, 298 F.Supp.2d 880, 883 (D. Minn. 2004) (citing *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986)). A Motion to Dismiss is granted "only if it is clear beyond any doubt that no relief could be granted under any set of facts consistent with the allegations in the Complaint." *Id.* The complaint survives a Motion to Dismiss if it "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Co. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1964 (2007).

In the current case, Plaintiff's claim gives Defendants notice of the grounds of the claim by identifying approximately fifty allegations, including at least nineteen direct quotes from the Defendants, six exhibits from Defendants' materials, and identifying Defendants' policies that amount to fraudulent conduct. The core of Plaintiff's complaint is exemplified by the very first line in Defendants' Admission Agreement, which states that Defendants agree "[t]o provide basic room and board, general nursing care, social services, dietary services, and activities *as required by law*," but, in fact, Defendants do not comply with state and federal law. Such statements induce Plaintiff and the putative class to enter their facilities, resulting in harm to Plaintiff and the putative class by failing

to provide the promised care.[1]  LaBore Aff. Ex. 1.  Such weighty allegations leave ample room for the Court to grant relief on facts consistent with those allegations.  *See Solvay*, 298 F. Supp. 2d at 883.  A jury must be allowed to evaluate the important factual allegations, based on all the evidence presented at trial.

In light of the low threshold to state a plausible claim and the Court's guidance to liberally construe the complaint, Plaintiff's consumer protection and VAA claims survive Defendants' Motion to Dismiss.  However, should the Court decide dismissal is appropriate, Plaintiff requests that dismissal be without prejudice and requests leave to amend the complaint.

Furthermore, Plaintiff's claims survive Defendants' motion to strike class allegations based on Federal Rule of Civil Procedure 23(a) and 23(b)(3).  Fed.R.Civ.P. 23(a) lists the prerequisites for certifying a class, generally known as numerosity, commonality, typicality, and adequate representation.  Fed.R.Civ.P. 23(a) (2008).  Certification of a class also requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.R.Civ.P. 23(b)(3).  The class allegations  apply to an entire group of vulnerable adults who may not receive any relief from Defendants' harm, but for their

---

[1] Plaintiff's exhibits are part of the pleadings since "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."  Fed.R.Civ.P. 10(c); s*ee Abels v.Farmers Commodities Corp.*, 259 F.3d 910, 921 (8th Cir. 2001).  Therefore, Defendants'' Admission Agreement as Exhibit 4 and all other Exhibits attached to the Complaint may be considered when ruling on a Rule 12(b)(6) motion to dismiss.  *Id.* (citing *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986)).

ability to join as a class. Those similarly situated to Plaintiff are in need of constant care, which leaves little resources, time, or energy to adjudicate individual claims. By allowing this group of vulnerable adults, who may not otherwise bring legal action, to join as a class by pooling resources, justice is served. Plaintiff need not prove individual reliance to certify the class and moreover has sufficiently pled a legal nexus between the Defendants' conduct and the Plaintiff's injuries. Accordingly, Defendants motion to strike class allegations should be denied. In the event the Court strikes the class allegations, Plaintiff requests leave to amend the complaint.

## II.  FACTUAL BACKGROUND

Defendants state that they will "provide basic room and board, general nursing care, social services, dietary services, and activities as required by law." LaBore Aff. Ex. 1. In addition, as a condition to receiving Medicare/Medicaid funds, Defendants agree to follow federal law. *See* 42 C.F.R. 483. In addition to Plaintiff's allegations and facts in her Complaint, and by the way of further example to the Court of Defendant's fraudulent conduct, Plaintiff provides the following facts. The facts provide additional detail regarding the law Defendants purport to follow versus their actual conduct, which results in inducement and harm to Plaintiff and the putative class.

### A.  Compliance with Federal, State and Local Laws, Regulations and Codes

- *"The facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility."* 42 C.F.R. § 483.75(b); *See* Minn. R. 4658.0015 (state companion rule) (emphasis added).

4

Specific regulations set minimum standards of care in areas of high risk to vulnerable adults. Plaintiff is not required in this memorandum to detail the specific nature of her claims since the Defendants are given adequate notice of the scope and nature of the causes of action in the Complaint. Further, Plaintiff is not citing these regulations to support claims for personal injury but rather as examples of how Defendants failed to meet state and federal laws yet stated or failed to disclose otherwise. By way of example, Plaintiff provides specific state and federal laws which have been violated by the Defendants as determined through annual surveys of Defendants' facilities conducted jointly by the Center for Medicare & Medicaid Services ("CMS") and the Minnesota Department of Health ("MDH").

To participate in the Medicare and Medicaid programs, nursing homes must be in compliance with the federal requirements for long term care facilities as prescribed in the 42 United States Code of Federal Regulations § 483. The following is a sample list of regulations and Defendants'' corresponding violation of those regulations (LaBore Aff. Ex. 2):

- Conduct initially a comprehensive and accurate assessment of each resident's functional capacity. 42 C.F.R. § 483.20; Minn. R. 4658.0400.

The following repeated violations were found for failure to meet the above standard regarding Comprehensive Assessments, as determined through the annual survey process over the last four year period: Richfield Health Center – 3; Health and Rehabilitation of New Brighton – 4; Galtier Health Center – 2; Park Health and Rehabilitation Center – 3;

Robbinsdale Rehab & Care Center – 4; Golden Valley Rehabilitation and Care – 3; Rose

of Sharon Manor – 1; Texas Terrace Care Center – 1. *See* Pl.'s Compl. at ¶¶ 68-78.

- Develop a comprehensive care plan for each resident. 42 C.F.R. § 483.20(k); Minn. R. 4658.0405, Subp. 1 (requiring a comprehensive care plan within 7 days of completion of the resident assessment).

The following repeated violations were found for failure to meet the above standard

regarding Care Plans, as determined through the annual survey process over the last four

year period:  Richfield Health Center – 4; Health and Rehabilitation of New Brighton – 4;

Galtier Health Center – 4; Park Health and Rehabilitation Center – 4; Robbinsdale Rehab

& Care Center – 2; Golden Valley Rehabilitation and Care – 4; Rose of Sharon Manor –

4; Texas Terrace Care – 3.

- Ensure that residents do not develop pressure sores and, if a resident has pressure sores, provide the necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing.  42 C.F.R. § 483.25(c).

The following repeated violations were found for failure to meet the above standard

regarding Pressure Ulcers and Skin Integrity, as determined through the annual survey

process over the last four year period:  Richfield Health Center – 4; Health and

Rehabilitation of New Brighton – 2; Galtier Health Center – 2; Park Health and

Rehabilitation Center – 2; Robbinsdale Rehab & Care Center – 3; Golden Valley

Rehabilitation and Care – 3; Rose of Sharon Manor – 1; Texas Terrace Care Center – 2.

- Provide appropriate treatment and services to incontinent residents to restore as much normal bladder functioning as possible. 42 C.F.R. §483.25(d); Minn. R. 4658.0520, Subp. 2(B) (requiring that an incontinent resident be checked at least every two hours following each episode of incontinence).

The following repeated violations were found for failure to meet the above standard regarding Urinary Incontinence, as determined through the annual survey process over the last four year period: Richfield Health Center – 2; Health and Rehabilitation of New Brighton – 3; Galtier Health Center – 2; Park Health and Rehabilitation Center – 2; Robbinsdale Rehab & Care Center – 2; Golden Valley Rehabilitation and Care – 2; Rose of Sharon Manor – 2; Texas Terrace Care Center – 2.

- Ensure that the resident receives adequate supervision and assistive devices to prevent accidents.  42 C.F.R. § 483.25(h).

The following repeated violations were found for failure to meet the above standard regarding Accidents, as determined through the annual survey process over the last four year period:  Richfield Health Center – 3; Galtier Health Center – 1; Park Health and Rehabilitation Center – 3; Robbinsdale Rehab & Care Center – 1; Golden Valley Rehabilitation and Care – 3; Texas Terrace Care Center – 1.

- Maintain acceptable parameters of nutritional status. 42 C.F.R. § 483.25(i); Minn. R. 4658.0530 (requiring self-help devices and "unhurried" assistance in eating, among other requirements).

The following repeated violations were found for failure to meet the above standard regarding Nutrition and Diet, as determined through the annual survey process over the last four year period:  Richfield Health Center – 1; Health and Rehabilitation of New Brighton – 3; Galtier Health Center – 3; Park Health and Rehabilitation Center – 1; Robbinsdale Rehab & Care Center – 2; Golden Valley Rehabilitation and Care – 2; Rose of Sharon Manor – 4; Texas Terrace Care Center – 2.

- Ensure that residents are free of any significant medication errors. 42 C.F.R. §483.25(m); Minn. R. 4658.1320, Subp. A (requiring a medication error rate of less than five percent).

The following repeated violations were found for failure to meet the above standard regarding Medication Errors and Drug Regimen, as determined through the annual survey process over the last four year period:  Richfield Health Center – 3; Health and Rehabilitation of New Brighton – 4; Galtier Health Center – 3; Park Health and Rehabilitation Center – 1; Robbinsdale Rehab & Care Center – 4; Golden Valley Rehabilitation and Care – 3; Rose of Sharon Manor – 3; Texas Terrace Care Center – 1.

### B.  Proper Care

- *"Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care."*  42 C.F.R. § 483.25; Minn. R. 4658.0405 (2007) (state companion rule) (emphasis added).

- *"A resident must receive nursing care and treatment, personal and custodial care, and supervision based on individual needs and preferences as identified in the comprehensive resident assessment and plan of care* as described in parts 4658.0400 and 4658.0405."  Minn. R. 4658.0520 (emphasis added).

- "Unless otherwise provided by law, including laws against discrimination, *residents must not be admitted or retained for whom care cannot be provided in keeping with their known physical, mental, or behavioral condition"*.  Minn. R. 4658.0140 (emphasis added).

The Defendants' use of the "24/7 Admission Policy" and "green, yellow and red" system, sets as policy the admission of all residents that are funded through Medicare A or have certain conditions, unless the corporate office approves of the discharge.  Pl.'s Compl. at ¶¶ 49-53, 56.  The Defendants' policy is especially

offensive since it mandates the acceptance of residents before any analysis or

assessment is performed to determine if the appropriate individualized care can be

provided by the facility, as required by law.  *See* 42 C.F.R. § 483.25; Minn. R.

4658.0405, 4658.0520, 4658.0140.

The Defendants explain in their 2007 Annual Report how they seek high

acuity Medicare residents on their website:

> *EHSI's results in 2007 highlight our strategy in action.* Our average daily
> Medicare Part A rate was US$395.56, an increase of 6.2% from US$372.32 in
> 2006. About half of the increase related to market *basket increases. The
> remainder mainly resulted from higher average acuity levels among our
> Medicare patients served. In 2007, 37.6% of EHSI's Medicare patients were
> in the nine highest Resource Utilization Groupings (RUGs) classifications,
> which provide the greatest reimbursement levels and cover the most complex
> medical and rehabilitative needs, versus 35.8% in 2006.* (emphasis added).

Extendicare Real Estate Investment Trust, *2007 Annual Report*, available at
http://www.extendicare.com/uploads/public/51/docs/EXE%20AR07_Complete%20-
revised%20March%2020.pdf.  LaBore Aff. Ex. 3.

Defendants' own statements corroborate their aggressive pursuit of admissions,

without regard to ability to meet resident needs, in violation of the law.

### C. Admissions Contract

- At the time of admission, *there must be a written agreement between
  the nursing home and the resident*, the resident's agent, or the
  resident's guardian, which includes the base rate *and what services and
  items are provided by the nursing home and are included in that base
  rate*.  Minn. R. 4658.0145, Subp. 1(A) (emphasis added).

Contrary to the detail required in the statute, Defendants use a uniform Admission

Agreement with boiler plate language for "Minnesota" residents of Extendicare facilities.

The Admissions Agreement is generic and uses the terms "Resident" instead of

individual names, and "Facility" instead of the name of the particular nursing home,

which in the case of Plaintiff Laura Bernstein is Texas Terrace Care Center.  LaBore Aff.

Ex. 1.

> - *An admission contract must not include a waiver of liability for health and safety or personal property of a resident while under the facility's supervision.  A facility contract must not include a provision that the facility knows or should know to be deceptive, unlawful, or unenforceable under state or federal law, nor any provision that requires or implies a lesser standard of standard of care or responsibility than is required by law.*  Minn. Stat. § 144.6501, subd. 2 (emphasis added).

Defendants' Admission Agreement contains a prohibited waiver of liability by stating

that, *"[t]he facility is not responsible to the Resident or Legal Representative or*

*Voluntary Guarantor, or his or her respective heirs, assigns, representatives, or estate*

*for any damages incurred by the Resident except if said damages are caused by the*

*negligence of the Facility, its employees, or agents acting within the scope of their*

*employment or agency*."  LaBore Aff. Ex. 1.

The Defendants require all vulnerable, elderly and infirmed residents of their

Minnesota facilities to sign an Admission Agreement that intentionally attempts to limit

economic damages resulting from Minnesota's CFA; DTPA; FSA; SCDP; and VAA, as

well as any other valid form of relief under any legal theory or cause of action beyond

that of negligence.

## D.  False and Misleading Website Statements

Defendants' website was designed to be an advertisement available to the general

public for the purpose of inducing individuals to sign the Admission Agreement.  These

10

advertisement statements give color and perspective to the allegations concerning Defendants' failure to comply with their statutory obligations.

The Defendants explain in their website "When choosing a facility it is important to consider your unique needs, preferences and desires". *Why Choose Extendicare?*, available at, http://www.extendicarecanada.com/why_choose_extendicare.aspx. LaBore Aff. Ex. 3. The Extendicare website is customized for persons looking for a nursing home and has many pages dedicated to the selection of a nursing facility. For example, the website has a section titled *Search for Facilities,* which advises potential residents in Minnesota the location of facilities and services available at each, including the residence of the Plaintiff, Texas Terrace Care Center. *Search for Facilities*, http://www.extendicare.com/ (last visited Jan. 9, 2009). LaBore Aff. Ex. 3. Additional sections include: *Making our Patients and Residents Matter; Why Choose Extendicare, Testimonials*; *Selecting A Facility*; and *Choosing A Home That is Right for You.* LaBore Aff. Ex. 3. Yet Defendants still ask the Court to believe that "none [of the statements alleged by Plaintiff from Defendants' website] are advertisements or directed to prospective residents." Defs.' Mem. at 12.

Plaintiff and the putative class relied on promises made by Defendants to them, as well as to the federal, state and local government, that Defendants would provide care in compliance with the law. As a result of Defendants' failure to comply with the state and federal regulations, Plaintiff was transferred on March 5, 2008, with one staff member when she required two, which resulted in serious and permanent injuries to her left knee and leg. Plaintiff is not pleading in this action a claim for negligence or the injuries, but

11

rather seeks remedies under Minnesota's Consumer Protection Statutes ("CPS") and VAA.

## III. ARGUMENTS

## A. PLAINTIFFS' CLAIMS ARE STATED WITH SUFFICIENT PARTICULARITY

Plaintiff's claims satisfy both Federal Rules of Civil Procedure 8(a) and 9(b). Fed.R.Civ.P. 8(a)(2) requires that the complaint be "a *short and plain statement* of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (2007) (emphasis added). If the complaint alleges fraud, it must generally also satisfy Rule 9(b), which requires that the claim be stated with "particularity."[2] Fed.R.Civ.P. 9(b). The requirements of Rule 8(a)(2) must be read in harmony with Rule 9(b)'s requirements. *See Carlson v. A.L.S. Enterprises, Inc.*, Civ. No. 07-3970, 2008 WL 185710, *5 (D. Minn. Jan. 18, 2008). LaBore Aff. Ex. 5. Plaintiff's complaint states that Extendicare Health Services, Inc., acting in unison with its facilities, knowingly made false representations as early as 2001 and on an ongoing basis. Pl.'s Compl. at ¶¶ 16, 57. Plaintiff further alleges that Defendants' representation that they operate their facilities in compliance with law when providing care is false and misleading and intended to induce

---

[2] Applying Minnesota law, the United States District Court recently opined that Rule 9(b) applies to both common-law fraud claims and statutory-fraud claims brought in federal court. *Carlson v. A.L.S. Enterprises, Inc.*, 2008 WL 185710, Civ. No. 07-3970, *2, fn4 (D. Minn. Jan. 18, 2008). In *Solvay Pharmaceuticals, Inc.*, the court did not reach the issue of whether the Plaintiff's fraud claims based on Minnesota law required a Rule 9(b) showing, summarily finding instead that the claim was pled with "sufficient specificity to meet the pleading standards of both Fed.R.Civ.P. 8 and 9(b)." 298 F.Supp.2d at 886.

Plaintiff and the putative class members to enter Defendants' facilities and resulted in adverse monetary, property, and health consequences to residents. *Id.* at ¶¶ 2, 37-40. LaBore Aff. Ex. 1. Plaintiff states her claim with sufficient particularity to survive this Motion to Dismiss. Indeed, Plaintiff resisted adding even more details to its already dense complaint so as not to run afoul of Fed.R.Civ.P. 8(a)(2).

Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). The purpose of Rule 9(b) is to "facilitate a defendant's ability to respond and to prepare a defense to charges of fraud." *Carlson*, Civ. No. 07-3970, 2008 WL 185710, at *3 (quoting *Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 629, 644 (8th Cir. 1995)). Plaintiff "need not state the exact particulars of every alleged instance of fraud, as long as the complaint includes enough detail to put the Defendant on notice of the factual 'core' of the fraud claims." *Id.* (quoting *Axcan Scandipharm Inc. v. Ethex Corp.*, Civ. No. 07-2256, 2007 WL 3095367, *2 (D. Minn. Oct. 19, 2007) (internal citations omitted)); LaBore Aff. Ex. 6. Pleading "every minute detail of a misrepresentation" claim is not necessary to satisfy Rule 9(b). *Id.* (citing *Commercial Prop. Invs., Inc.*, 61 F.3d at 644). Although one allegation taken alone may fail the particularity test, the complaint as a whole may satisfy Rule 9(b). *Evangelical Lutheran Church in Am. Bd. of Pensions v. Spherion Pac. Workforce LLC,* Civ. No. 04-4791, 2005 WL 1041487, at *3 (D. Minn. May 4, 2005) (finding plaintiff's claim for negligent

misrepresentation satisfied Rule 9(b) despite some general averments); LaBore Aff. Ex. 7.

Defendants argue that Plaintiff's claim does not satisfy Rule 9(b) because it fails to plead the "who, what, when, where and how" of the fraudulent claims. Defs.' Mem. at 5. However, the law does not require the level of detail demanded by the Defendants. The standard for surviving a Motion to Dismiss is whether the claim informs the Defendant of the factual core of the claim in order to develop a response, not a prescribed checklist of data. *See, e.g., Commercial Prop. Invs., Inc.*, 61 F.3d at 644.

In *Carlson*, the Plaintiff sued under the Minnesota's CFA, DTPA, and Unlawful Trade Practices Act. *Carlson*, Civ. No. 07-3970, 2008 WL 185710, at *1 (seeking class action status on a claim that "Scent-Lok" hunting clothing did not eliminate human odors nor could be reactivated as advertised). The court found that the Plaintiff's claim satisfied the what, when, where, and how of Rule 9(b) when it identified sixteen statements published by the Defendants in advertising and marketing materials and on websites that were made on an ongoing basis.[3] *Id.* at *3. The court specifically noted that Plaintiffs were not required to give exact dates of the statements. *Id.* Similarly, in *Solvay*, the court found that the Plaintiff's allegation of false advertising on an ongoing basis for "several years" satisfied Rule 9(b). 298 F.Supp.2d 880 at 885-86. The court in

---

[3] In *Carlson*, Plaintiff joined five separate businesses as Defendants. *Carlson*, Civ. No. 07-3970, 2008 WL 185710, at *1. Although meeting the "what, when, where, and how" of Rule 9(b), the court granted the Defendants' motion to dismiss without prejudice with leave to amend because the complaint lacked sufficient particularity to determine which of the Defendants made the alleged misleading statements. *Carlson*, Civ. No. 07-3970, 2008 WL 185710, at *5.

*Solvay* went on to find sufficient specificity to meet Rule 9(b) when the Plaintiff alleged that the Defendant's promotional materials falsely stated or implied that a pancreatic enzyme supplement was "comparable" and an "alternative" to Defendant's supplement, when in fact the Food and Drug Administration ("FDA") had never made a determination that the drugs were therapeutically equivalent. *Id.* at 885-86.

In *Yarrington v. Solvay Pharmaceuticals, Inc.*, the court found enough particularity to satisfy Rule 9(b) when the Plaintiff alleged only one misrepresentation in an action against a drug maker -- that the Defendant "checked a box on a Department of Defense form indicating that [the drug in question] was FDA approved" when the drug had received no FDA approval.  No. A05-2288, 2006 WL 2729463, *5 (Minn. Ct. App. Sept. 26, 2006); LaBore Aff. Ex. 8.

Based on prior case law, Plaintiff's claim provides sufficient detail to put the Defendants on notice of the fraud claims and meets Rule 9(b) pleading standards.  Any additional ambiguities concerning the particularity of the claims can be clarified during discovery. *See Carlson*, Civ. No. 07-3970, 2008 WL 185710, at *3.

Notwithstanding the above, Plaintiff illustrates the particularity of her Complaint. First, the complaint sufficiently identifies "who" made the alleged statements and misrepresentations.  Based on Defendants' own marketing materials, both named Defendants act in concert to provide unified care at the Defendants' facilities.[4]  Thus,

---

[4] Extendicare Health Services, Inc. itself supports a unified management by stating that: "[w]e manage our operations as a single unit." (Pl.'s Compl. at ¶ 16) and "[s]enior departmental staff . . .are responsible for the development and implementation of corporate-wide policies." (*Id.* at ¶ 18).

each Defendant is implicated by statements made by either Defendant, and each is put on notice of the claims against them. This is distinguishable from *Carslon*, where the only reason to grant the motion to dismiss was because Plaintiff named five separate Defendants without identifying which Defendant made the alleged statements. *Carlson*, Civ. No. 07-3970, 2008 WL 185710, at *4.

In addition, the Complaint alleges various personnel and departments identified by the Defendants, who are responsible for perpetuating fraudulent statements, such as senior departmental staff responsible for the development of corporate-wide policies and marketing initiatives (Pl.'s Compl. at ¶ 18-19). Finally, Plaintiff alleges specific individuals who made statements or perpetuated policies contributing toward misrepresentations: (1) Defendants' new president to maximize profits by making admissions decisions based upon payor source (*Id.* at ¶ 57); and (2) Defendants' Vice-President of Marketing suggesting "tactics" to pressure vulnerable residents to choose Extendicare facilities (*Id.* at ¶ 58).

Plaintiff similarly satisfies the "what" requirement by identifying specific fraudulent statements. Plaintiff alleges the following statements in Defendants' own Admission Agreement:

1. "Facility agrees to provide basic room and board, general nursing care, social services, dietary services, and activities *as required by law*." (Pl.'s Compl. at ¶ 36; LaBore Aff. Ex. 1 at ¶ A(1)) (emphasis added).

2. "The Facility shall not be liable to the Resident or Legal Representative or Voluntary Guarantor, or his or her respective heirs, assigns, representatives, or estate for any damages incurred by the Resident except if said damages are caused

by the negligence of the Facility, its employees, or agents acting within the scope of their employment or agency. It is understood and agreed that the Facility is not in any manner to be considered an insurer of the health, safety, or welfare of the Resident." (Pl.'s Compl. at ¶¶ 8, 43-44; LaBore Aff. Ex. 1 at ¶ E(5)).

Moreover, on website promotional materials, Defendants state that:

3. "Extendicare Health Services, Inc. is committed to providing health care services *in compliance with applicable laws and regulations*." (Pl.'s Compl. at ¶ 3) (emphasis added).

4. "On both sides of the border, Extendicare has always maintained quality standards *above government regulations* and this is a tradition that will continue within our new operating structure." (*Id.* at ¶¶ 2, 46) (emphasis added).

Plaintiff asserts that Defendants' representations that their facilities provide services as required by law and maintain standards above government regulations are fraudulent because Defendants knowingly:

1. Incur and fail to disclose a plethora of statutory violations cited by the Minnesota Department of Health,[5] and substandard care according to federal "Quality Indicators," compromising care and violating the law (*Id.* at ¶¶ 2, 40, 96).

2. Set a "24/7 Extendicare Admission Policy" that automatically admits vulnerable adults with certain health needs without assessment of whether the facility can actually provide requisite care for the applicant and current residents, compromising care and violating the law. (*Id.* at ¶¶ 5-6, 49-51, 61-64; Ex. 2).

3. Force residents to sign an Admission Agreement that attempts to waive facility liability for damage to health or property of the resident, compromising care and violating the law. (*Id.* at ¶ 8; LaBore Aff. Ex. 1).

4. Fail to provide adequate staffing levels and services to meet the needs of Plaintiff and the putative class, compromising care and violating the law. (Pl.'s Compl. at ¶¶ 38, 63, 82, 89-90, 96; LaBore Aff. Ex. 1).

5. Make decisions for admission based upon payer source, comprising care and violating the law. (Pl.'s Compl. at ¶¶ 55, 57).

---

[5] Defendants' ten Minnesota facilities were cited for at least 270 total deficiencies, using calculations from certain years between 2004 and 2008. Pl.'s Compl. at ¶¶ 68-78.

Defendant argues that the "what" of the complaint is particularly lacking and does not place them on notice of the fraudulent claims. Defs.' Mem. at 6-7. In *Yarrington*, one checkbox was sufficient to plead with particularity. No. A05-2288, 2006 WL 2729463, *5. Here, Plaintiff alleges, by way of example, at least four statements listed above with specificity and at least five ways in which the statements are fraudulent or misleading, thus more than satisfying Rule 9(b). Defendants also argue that none of their website statements "are directed to prospective residents" or "have anything to do with the particular facility at which Plaintiff resides." Defs.' Mem. at 7. On the contrary, websites are created for the very purpose of advertising and are equally available to residents of all of Defendants' facilities. *See supra* II. Factual Background at 11-12. Moreover, the statements quoted from Defendants' Admission Agreement are most certainly directed at prospective residents, including Plaintiff and the putative class. LaBore Aff. Ex. 1. Plaintiff maintains that the fraudulent statements are not only sufficiently pled, but are particularly egregious in light of being made to vulnerable adults, right up to the moment they sign Defendants' Admission Agreement. Pl.'s Compl. at ¶ 40.

Plaintiff's claims also sufficiently state "where" the statements were made. Specifically, Defendants' fraudulent statements were disseminated in Defendants' Admission Agreement (*Id.* at ¶¶ 8, 36; 43-44); corporate reorganization materials (*Id.* at ¶ 2; LaBore Aff. Ex. 1); Defendants' "Code of Conduct" (*Id.* at ¶ 3);  and marketing

18

materials (*Id.* at ¶¶ 9, 45). Such statements were made via Defendants' website (*Id.* at ¶¶ 2, 3, 45-46), in informational and publicity materials, and in brochures (*Id.* at ¶ 45-46).

The fraudulent statements were made on an ongoing basis, at least during the six year interval specified in the class action allegations, satisfying the "when" requirement. *Id.* at ¶ 24. Similar to *Solvay* and *Carlson*, exact dates are not necessary. *See Solvay,* 298 F.Supp.2d at 885-86; *Carlson,* Civ. No. 07-3970, 2008 WL 185710, at *3. Plaintiff's complaint includes specific dates (i.e., beginning in at least December 2001) when Extendicare Health Services, Inc. instituted its new admission policies based on payor source, which led to misrepresentations. Pl's Compl. at ¶ 57. In 2002, Plaintiff alleges that Extendicare Health Services, Inc.'s Vice-President of Marketing advised the use of tactics to pressure vulnerable adults to choose Extendicare facilities, amounting to misrepresentation of Defendants' compliance with the law. *Id.* at ¶ 58. As of at least February 15, 2005, Defendants made fraudulent statements in their Admission Agreement. LaBore Aff. Ex. 1. Such references more than adequately establish when Defendants' fraudulent statements were made.

The complaint sufficiently alleges "how" Plaintiff and the putative class were misled and harmed by Defendants' statements and failure to disclose their practices. In short, Defendants state that they comply with the law, when in fact they do not. More importantly, if Plaintiff and the putative class had known that Defendants did not operate within the bounds of the law, they would not have entered Defendants' facilities. Pl.'s Compl. at ¶¶ 2, 40. Moreover, Plaintiff and the putative class continue to suffer adverse monetary and health consequences from Defendants' illegal practices. *Id.* at ¶¶ 37-39.

For example, Plaintiff alleges that she and the putative class were harmed as a result

of Defendants' fraudulent statements by:

1. Inducing them to enter Defendants' facilities under false pretense, resulting in long-term care that fails to meet their needs. Pl.'s Compl. at ¶ 40.

2. Causing loss of monetary value by paying the Defendants for skilled nursing services that were never rendered or never received due to understaffing. *Id.* at ¶¶ 37-38.

3. Placing them at risk of further injury or adverse health consequences. *Id.* at ¶¶ 51&52.

4. Violating resident's rights and receiving substandard care as exemplified by receiving hundreds of Minnesota Department of Health deficiencies. *Id.* at ¶¶ 68-78.

Plaintiff sufficiently pled how she and the putative class were harmed. Defendants

argue that Plaintiff's allegations fall "far short of the particularity needed to plead *how*

Defendants' alleged violation of CFA, DTPA, and FSA caused her damages." Defs.'

Mem. at 10 (citing *In re St. Jude Medical, Inc.*, 522 F.3d 836, 839 (8th Cir. 2008)).

However, causation is an issue in recovery of damages in a fraud claim, not an issue in

pleading a claim of fraud with enough particularity to satisfy Rule 9(b). *See Group*

*Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 14 (Minn. 2001) (discussing

whether reliance and causation must be pled and proved to recover damages and noting

that Rule 9(b) was not discussed); *In re St. Jude Medical, Inc.*, 522 F.3d at 838

(discussing certification of a class action, not Rule 9(b)). Contrary to Defendants'

arguments, a Rule 9(b) showing of particularity requires only enough particularity to

place the Defendant on notice of the claim. *See Commercial Prop. Invs., Inc.,* 61 F.3d at

20

644; *Evangelical Lutheran Church in Am. Bd. of Pension,* Civ. No. 04-4791, 2005 WL
1041487, at *3.

   Such detail, as listed above, more than adequately informs the Defendants of the
factual core of the claim and thus satisfies Rule 9(b). Even if some details are lacking,
the Court may look at Plaintiff's complaint as a whole to find particularity. *See*
*Evangelical Lutheran Church in Am. Bd. of Pension,* Civ. No. 04-4791, 2005 WL
1041487, at *3. Furthermore, as prior case law cited by Defendants suggests, even when
a court dismisses consumer protection claims on particularity grounds, the dismissal is
often without prejudice and leave to amend is granted. *See Carlson*, Civ. No. 07-3970,
2008 WL 185710, at *5; *ADT Security Servs. v. Swenson*, 2008 WL 2828867 (D. Minn.
July 21, 2008) (slip copy) (LaBore Aff. Ex. 9); *Tuttle v. Lorillard Tobacco Co.*, 118
F.Supp.2d 954, 964-65 (D. Minn. 2000) (allowing up to 60 days to amend).

   In addition to moving to dismiss Plaintiff's CFA, DTPA, and FSA claims, Defendants
summarily move to dismiss Plaintiff's SCDP claim based on consumer fraud directed at
senior citizens and disabled persons. Defs.' Mem. at 1, fn1. The SCDP claim is a
unique, actionable count that is separately pled. Pl.'s Compl. at ¶¶ 98-101. The
Minnesota legislature specifically intended to offer additional protections to seniors and
disabled persons who are particularly vulnerable to consumer fraud, as exemplified by
the fact that SCDP is the only CPS that allows for supplemental civil penalties (subd.
2(a)); restitution (subd. 3); and private remedies (subd. 4). Minn. Stat. § 325F.71, subds.
2-4. Defendants' statements and practices are particularly alarming considering that they

are directed at vulnerable senior citizens and disabled persons upon entering Defendants'

long-term care facilities, the very situation the statute seeks to address.

According to the language of the statute, a violation of SCDP is found when two

requirements are met:  (1) Defendant violates one of the three Consumer Protection

Statutes (CFA, FSA, or DTPA) listed in § 325F.71, subd. 2(a); and (2) one or more

of the four factors is present from § 325F.71, subd. 2(b).[6]  Plaintiff alleges that

Defendants violated Minnesota's DTPA, FSA, and CFA.  A violation of any one of

those three statutes invokes the provisions of SCDP.  Minn. Stat. § 325F.71, subd.

2(a).  Also, Defendants operate skilled nursing facilities and knew their conduct

was directed at senior citizens or disabled persons when making the fraudulent

statements, thus meeting the first of four factors of § 325F.71, subd. 2(b).[7]  *See* §

325F.71, subd. 2(b)(1); Pl.'s Compl. at ¶¶ 40, 58, 68-78 (referencing Defendants'

"tactics" to pressure vulnerable adults to choose Extendicare facilities and multiple

Minnesota Department of Health deficiencies flowing from care provided to those age 62

---

[6] The four factors are whether: (1) Defendants knew that their fraudulent conduct was aimed at senior citizens or disabled persons; (2) Defendants caused senior citizens or disabled persons to suffer loss of income or property; (3) senior citizens or disabled persons were more vulnerable to Defendants' conduct because of age or infirmity and actually suffered harm; OR (4) Defendants' conduct caused a senior citizen or disabled person to make an uncompensated asset transfer that resulted in ineligibility for medical assistance.  Minn. Stat. § 325F.71, subd. 2(b)(1)-(4).

[7] A senior citizen is defined as: "a person who is 62 years of age or older." Minn. Stat. § 325F.71, subd. 1(a).  A "disabled person" under the statute is "a person who has an impairment of physical or mental function or emotional status that substantially limits one or more major life activities," such as self-care, walking, seeing, hearing, breathing, learning, or working.  Minn. Stat. § 325F.71, subds. 1(b)&(c).